UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FRANK P. GRANDE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-03-177-B-W |
| | ) | |
| ST. PAUL FIRE & MARINE INSURANCE | ) | |
| COMPANY and CHARTER LAKES | ) | |
| MARINE INSURANCE, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW
AND MOTION FOR A NEW TRIAL**

In light of the law determined by the First Circuit in its opinion and the facts found by the jury in its verdict, the Court denies Defendants' motion for judgment as a matter of law or a new trial.

**I. STATEMENT OF FACTS**

In the late 1990s and early 2000s, Frank P. Grande (Frank P.) owned and chartered, off the coast of Maine, a 25 foot sailing vessel, the APHRODITE. Like many boat owners, he began to long for something bigger and in the spring of 2003, while visiting his wealthy Texas cousin, Frank A. Grande (Frank A.), they struck a deal: Frank A. would loan Frank P. the money to purchase a bigger boat and Frank P. would repay his cousin through the sale of the APHRODITE and his house in Maine. There was nothing in writing.

Frank P. traveled to south Florida to shop for boats and Frank A. later joined him. They fixed upon a vessel, the GINA, a 44 foot Irwin. Frank A., who was wise in the ways of business and was fronting the money, did the negotiating with the GINA's owner. The

1

negotiations were successful and Frank A. returned to Texas.  On April 28, 2003, a purchase and sale agreement was entered into between the GINA's owner and Frank A.  Frank A. paid the $75,000.00 purchase price for the GINA and the Bill of Sale was made out to him, not to Frank P.

Frank P. proceeded to make arrangements to sail the GINA from Florida to Maine. One of those arrangements was insurance.  Frank P. had insured the APHRODITE for a number of years through a marine insurance agency, Charter Lakes Marine Insurance (Charter Lakes).  The APHRODITE policy was issued by St. Paul Fire and Marine Insurance Company (St. Paul) and contained a navigation limit which read:  "Atlantic coastal waters of the United States between Eastport ME and Saint Marys, GA not more than 100 miles from shore.  Coastal Atlantic – Maine."  Just before the GINA was purchased, Frank P. contacted his charter insurance agent, Mark VanEpps of Charter Lakes and notified Mr. VanEpps that he was going to require marine insurance on the GINA.  He explained that he intended to sail the vessel "as the crow flies" from Miami to Maine, that he had never taken a similar voyage before, and that he was relying on him to secure the proper insurance.  Mr. VanEpps informed Frank P. that the insurance company required a survey of the vessel and Frank P. set about obtaining the survey.

On April 28, 2003, Mr. VanEpps faxed Frank P. a quote for insuring the GINA.  The letter enclosed an application, requested a copy of the survey, and stated in part:  "There will be a one time trip fee of $150 for navigating your boat from Coconut, FL[1] to your homeport of Long Cove, ME."  The total premium for the basic coverage was $2,094.00.  Frank P. faxed the completed application to Mr. VanEpps along with the survey  on April 28, 2003. Between April 28, 2003 and May 6, 2003, when he left Florida, Frank P. telephoned Mr.

---

[1] The Court assumes this was a misprint and Mr. VanEpps intended to refer to Coconut Grove, Florida.

VanEpps to confirm that he had received the paperwork, that it was in good order, and that coverage was in place.  Frank P. expressly asked Mr. VanEpps whether he was covered for the trip from Florida to Maine and Mr. VanEpps responded, "You are good to go at any time."  Frank P. also asked about paying the insurance premium and Mr. VanEpps told him he would be billed.[2]  Frank P. set sail for Maine on May 6, 2003.

After a brief stopover in Charleston, South Carolina, Frank P. headed north.  As they passed Cape Hatteras, North Carolina, the evening of May 17, 2003, Frank P. who was on wheel watch observed four water spouts in the distance.  He was terrified and took evasive action, ultimately traveling east, beyond 100 miles from shore.  The next day, they raised the sails and shut off the diesel engine.  At this point, however, a crew member informed Frank P. that one of the lower shrouds that secured the mast had snapped and without its support, the mast was itself in danger of snapping.  Despite jury-rigged repairs, the mast was still flexing 2 to 3 feet and seas were building.  They issued pan-pan calls and the HAWAII HORIZON, a 670 foot container ship, responded, standing by the GINA for four hours during the night.  Seas rose to eight to twelve feet with swells to fifteen feet.  Ultimately, a Coast Guard helicopter arrived and Frank P. and the crew were rescued.  When they abandoned the GINA, the vessel was more than 100 miles off shore.[3]

On May 19, 2003, Frank P. filed a notice of claim with Charter Lakes and by a letter dated May 22, 2003, he received a reservation of rights notice from St. Paul.  The letter explained that "the facts obtained thus far indicate that you may have been outside of your navigational limits as defined by the Declarations Page of your policy."  About the same

---

[2] On May 19, 2003, Charter Lakes sent Frank P. a bill for $2,244.00, including the $150.00 for trip coverage, which Frank A. paid in full on May 23, 2003.

[3] Although later salvaged, the parties stipulated that the GINA was a constructive total loss.  *See Order on Post-Trial Issues* at 7, n.10, 11 (Docket # 170).

time, he received the marine insurance policy from St. Paul, which contained a Yacht Voyage/Trip Endorsement, specifying the following limit of navigation: **ATLANTIC coastal waters of the United States between Coconut, FL and Long Cove, ME not more than 100 miles from shore.** St. Paul formally denied coverage on August 12, 2003 on the ground that the GINA "was abandoned… approximately 160 miles from the closest point of land" and therefore coverage was "excluded by your policy."  This law suit ensued.

## II.  THE TRAVEL OF THE CASE

This case has a history.  Initiated by complaint filed October 2, 2003, the case originally went to a jury trial on April 12, 2005.  At the close of Frank P.'s case, this Court granted judgment as a matter of law.  *Grande v. St. Paul Fire & Marine Ins. Co.*, 365 F. Supp. 2d 57 (D. Me. 2005).  Frank P. successfully appealed to the First Circuit.  *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277 (1st Cir. 2006).  The First Circuit decision informs and controls the issues in this case.

In *Grande*, the First Circuit concluded that whether there was a "special agreement" between Frank P. and the Defendants to provide coverage for the trip "unconstrained by a 100-mile limit" is a jury question.  *Grande*, 436 F.3d at 281.  Thus, "when VanEpps said that insurance was in force, a jury could find (although not obliged to do so) that the parties were agreeing that the insurance was in force for the trip as described by Frank P. to VanEpps." *Id.*

The First Circuit came to the same conclusion about Frank P.'s failure to inform the Defendants of his cousin's interest in the vessel.  *Id.* at 282.  This Court had granted judgment as a matter of law in the first trial, in part, on the ground that, under maritime law, ownership is material to the acceptance of the risk.  *Grande*, 365 F. Supp. 2d at 66.

However, on appeal, the First Circuit reiterated the principle that "materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances." *Grande*, 436 F.3d at 283. Further, the First Circuit explained that "[i]f Frank P.'s testimony is credited, then he might be regarded as 'the owner' in the legal sense… and in the economic sense…." *Grande*, 436 F.3d at 282. In any event, the precise nature of Frank P. and Frank A.'s interest in the GINA is "a matter for the jury." *Id.* at 283.

The case was retried before a jury from July 18, 2006 through July 20, 2006. The jury returned a verdict in favor of the Plaintiff and against Defendants St. Paul. and Charter Lakes in the total amount of $79,579.00. *Jury Verdict* (Docket # 158). Post-trial motions followed the verdict. *Pl.'s Post-Trial Br.* (Docket # 160); *Defs.' Post-Trial Br.* (Docket # 165); *Defs.' Mot. for J. as a Matter of Law or New Trial* (Docket # 161, 162) (*Defs.' Mot.*); *Pl.'s Resp. in Opp'n to Defs.' Mot.* (Docket # 167) (*Pl.'s Resp.*); *Defs.' Reply to Pl.'s Resp.* (Docket # 169); *Pl.'s Bill of Costs* (Docket # 166); *Defs.' Objection to Pl.'s Bill of Costs* (Docket # 168). On October 27, 2006, the Court issued an Order addressing certain post-trial issues. *Order on Post-Trial Issues* (Docket # 170); *Am. J.* (Docket # 171).

## III. DEFENDANTS' MOTION

On August 3, 2006, Defendants filed a post-trial consolidated motion and memorandum for judgment as a matter of law or for a new trial. *Defs.' Mot.* Regarding the motion for judgment as a matter of law, Defendants contend that there is no evidentiary basis for the jury's verdict that a special agreement between the parties existed to provide insurance on the GINA for the trip from Florida to Maine without navigational limits, and that no reasonable jury could conclude that Frank P. did not misrepresent or conceal material

facts.  *Id.* at 2-5.  Regarding the motion for a new trial, Defendants claim that the verdict was

against the weight of the evidence.  *Id.* at 5-6.

## IV.  DISCUSSION

### A.  Motion for Judgment as a Matter of Law

#### 1.  Legal Standard

At the close of all the evidence, the Defendants moved for judgment as a matter of

law pursuant to Rule 50(a) and now timely renew the motion under Rule 50(b).  Fed. R. Civ.

P. 50(a), (b).  To succeed, the Defendants must establish that there is "no legally sufficient

evidentiary basis for a reasonable jury to find for [the Plaintiff]…."  *Id.*  The First Circuit has

commented that "[a] party seeking to overturn a jury verdict faces an uphill battle.  Courts

may only grant a judgment contravening a jury's determination when the evidence points so

strongly and overwhelmingly in favor of the moving party that no reasonable jury could have

returned a verdict adverse to that party."  *Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162,

167 (1st Cir. 2005) (citation and quotation marks omitted).   In *Rivera Castillo*, the First

Circuit wrote,

> Even in the best of circumstances, the standards for granting a
> motion for judgment as a matter of law are stringent. Courts
> may only grant a judgment contravening a jury's determination
> when the evidence points so strongly and overwhelmingly in
> favor of the moving party that no reasonable jury could have
> returned a verdict adverse to that party.

*Rivera Castillo v. Autokirey, Inc*., 379 F.3d 4, 9 (1st Cir. 2004) (citation and quotation marks

omitted).  Finally,

> A motion for judgment as a matter of law only may be granted
> when, after examining the evidence of record and drawing all
> reasonable inferences in favor of the nonmoving party, the
> record reveals no sufficient evidentiary basis for the verdict.
> This review is weighted toward preservation of the jury verdict,

> which stands unless the evidence was so strongly and
> overwhelmingly inconsistent with the verdict that no
> reasonable jury could have returned it.

*Crowe v. Bolduc*, 334 F.3d 124, 134 (1st Cir. 2003) (internal citation and quotation marks omitted).

### 2.  The Evidence

Applying the First Circuit's opinion to the evidence at trial, the Defendants' arguments are doomed.   The First Circuit previously vacated and remanded this case expressly because it concluded there were jury questions about whether a special agreement had been entered into and whether Frank P.'s representations were material.   Now that the jury has resolved each question against the Defendants, they are in a particularly hard place, arguing against the combined weight of First Circuit authority and the jury verdict.

Concerning the special agreement issue, the First Circuit noted that Frank P.

> …testified that he . . . asked VanEpps for coverage for the trip
> from Florida to Maine and that he told VanEpps that the GINA
> would follow the most direct course (which a reasonable jury
> might find - - based on the chart submitted into evidence - -
> would take her more than 100 miles offshore).

*Grande*, 436 F.3d at 281.   The First Circuit concluded that "when VanEpps said that insurance was in force, a jury could find (although not obliged to do so) that the parties were agreeing that the insurance was in force for the trip as described by Frank P. to VanEpps." *Id.*   At re-trial, this very evidence was reiterated.   Frank P. testified that he told Mr. VanEpps that he intended to travel from Florida to Maine as the crow flies and VanEpps told him he was good to go.   Now, rather than what a jury could find, the Court must evaluate what the jury did find from the evidence presented.   In light of the First Circuit's guidance and the evidence at trial, Defendants' motion is virtually frivolous.

The same is true of materiality.  Defendants vainly argue that there is no evidence that can sustain the jury finding that Frank P. did not intentionally misrepresent his ownership in the GINA, since the documents and statements he made to Charter Lakes falsely indicate that he was the owner and he never mentioned his cousin's involvement.  Again, the First Circuit forecloses Defendants' argument at this stage.  In reviewing the evidence at the first trial, the First Circuit presaged the evidence that would be presented at the second trial and found it sufficient to sustain a verdict.  *Grande*, 436 F.3d at 282-83.  The First Circuit wrote that it "may be debatable whether Frank P. was the 'owner'; on the one hand, his cousin, Frank A., paid for the vessel and the bill of sale was made out to Frank A.  On the other hand, Frank P. testified that it was understood between the two cousins that Frank P. then became the owner of the boat, subject to an obligation to repay the purchase price in due course."  *Id.* at 282.  The First Circuit went on to say that if "Frank P.'s testimony is credited, then he might be regarded as 'the owner' in the legal sense (given the intention of the cousins as to ownership) and in the economic sense (if, as appears to have been the case, Frank P. bore the risk of loss in the event that the boat sank uninsured)."  *Id.*   The First Circuit concluded "this is a matter for the jury."  *Id.* at 283.

The jury has now spoken.  The jury could easily have disbelieved the defendants' witnesses, who testified that they would not have issued any coverage for the GINA, had they known of the financial arrangement between Frank P. and Frank A.  These witnesses testified that the insurer's denial of coverage would be based on the premise that an owner, because he has an investment in the vessel, would likely take better care of the vessel and operate it more safely than a non-owner.  Indeed, the evidence was overwhelming that these rationales did not apply.  Frank P. had every incentive to protect the GINA and to operate it

safely.  The cousins testified that Frank P. had agreed to repay Frank A. all the money that he had extended and the risk of loss fell on Frank P.  In fact, by his own description, Frank P. ended up risking his life to save the vessel.  Yet, the Defendants would have insured the GINA under Frank A., a man who had never previously owned or sailed a sailing vessel.  In light of this evidence, the jury was entitled to find that the significance of technical ownership in this context amounted to a retrospective excuse to deny coverage of an otherwise covered loss.  The jury could have concluded – as Plaintiff's counsel argued – that the arrangement between Frank P. and Frank A. was no different than the typical arrangement between a bank and a homeowner, where insurance is routinely extended.

The jury conclusions that the parties had entered into a special agreement and that Frank A.'s technical ownership was not material to the issuance of the policy were based on substantial evidence; the motion for judgment as a matter of law must fail.

### B.  Motion for a New Trial

#### 1.  Legal Standard

Rule 59 allows a party to move for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States…." Fed. R. Civ. P. 59(a).  The First Circuit has stated that "[t]he decision to grant a new trial is squarely within the trial court's discretion." *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993).  Moreover, trial judges have "more leeway to grant new trials than to set aside verdicts based on insufficiency of the evidence under Rule 50" and "[t]hey may consider their view of the credibility of the witnesses in doing so." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 104 (1st Cir. 2006).

Nevertheless, the First Circuit has cautioned that a trial court's "discretion is quite limited concerning motions for new trials. A trial judge may not upset the jury's verdict merely because he or she might have decided the case differently." *Velazquez,* 996 F.2d at 428. They "must be careful not to invade the jury's province." *Valentin-Almeyda*, 447 F.3d at 104. Trial judges "may grant a new trial only if they are convinced that the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice." *Id.*

## 2. The Evidence

Defendants attack the verdict on two grounds. First, they claim that the credibility of Frank P. and Frank A. is suspect because they are cousins, who have a "personal and pecuniary interest in the outcome of the case…" *Defs.' Mot.* at 5. Second, they state that "insurance without navigational limits is a product that does not exist in the marine insurance industry and certainly not in the charter boat program underwritten by St. Paul," that if Frank P. had "asked for no navigational limits or limits beyond 100 miles from shore, he would not have received this coverage," and if he had "disclosed the true facts about ownership… he would not have received any insurance coverage at all." *Id*. at 6.

The Court does not agree. As to Defendants' first argument, it is within the jury's province to assess the credibility of witnesses. Defendants' attempts to undercut the Grandes' credibility were presented in evidence, pressed at trial, and ultimately rejected by the jury. In the Court's view, to accept the testimony of Frank P. and Frank A. would not result in a miscarriage of justice; to the contrary, the Grandes' testimony concerning their somewhat unusual intra-family financial arrangement had the ring of truth.

As to Defendants' second argument, Defendants themselves produced a witness whose testimony seems to contradict critical aspects of Defendants' central defense, namely that marine insurance is unavailable for vessels that exceed the 100 mile navigational limit. On July 20, 2006, Daniel Longman, the President and CEO of Charter Lakes, testified on direct examination that the insurance agency had never listed a marine insurance policy without navigational limits.  He was then asked:

> Q.  If Mr. Grande had come to your agency and said, I just need insurance for a month or so so I can make a single trip, Florida to Maine, Maine to Nova Scotia, a single trip, would he have gotten that through your agency?
> A.  No.

On cross-examination, he was pointedly asked whether, in the past ten years, he had ever been approached by a customer on the Atlantic coast for trip insurance to Bermuda or the Bahamas.  Surprisingly, Mr. Longman acknowledged that the underwriter could issue such a trip endorsement.[4]  In fact, he testified that for the Bahamas, "some underwriters actually have navigation that includes the Bahamas in their south Atlantic navigation.  So you pay a premium up front, and you're free to go to the Bahamas back and forth… when you want to."  He was then asked:

> Q.  When I was listening to you on direct, I thought I heard that you - - that Charter Lakes could not issue insurance for a single trip.  Is that what your testimony was?
> A.  No - - well, what - - in the context of the question, the question, first of all, under the guidelines, we can issue annual policies, 12-month policies.  Now, when we have a 12-month policy in place, then we can issue an endorsement for a one-time trip.

---

[4] Mr. Longman's response was initially somewhat garbled:
> Q.  And you've allowed him to do that (go on an insured trip to Bermuda)?
> A.  Um, the underwriter - - that was underwritten by the underwriter, and they were issued a trip endorsement, yes.

During their closing argument, the Defendants repeated to the jury that "there is no such thing as a policy without navigational limits. It doesn't exist." The Defendants never offered an explanation as to why one-time trip insurance beyond the 100 mile limit would be available to some policyholders, but not to Frank P.[5]

In addition to Mr. Longman's testimony, Frank P. testified that, after this incident, he sought coverage from other insurers through other marine agencies. He introduced two marine insurance quotes. The first had a cruising limit of "Atlantic Coastal Waters Excluding Florida," but no express mileage limit from shore and the second had a navigation limit not to exceed 250 miles offshore. Based on this cumulative testimony, the jury was entitled to reject one of the fulcrums of the Defendants' defense: that insurance coverage for the trip from Florida to Maine without a 100 mile navigational limit was unavailable.

Finally, the Court does not accept the Defendants' argument that the jury verdict was the result of undue sympathy for the individual Plaintiff against the insurance company and agency Defendants, nor does it accept the notion that the verdict constitutes a miscarriage of justice.

## IV. CONCLUSION

The Court DENIES Defendants' Motion for Judgment as a Matter of Law or Motion for a New Trial (Docket #'s 161 and 162).

---

[5] It may be that trip insurance is available only for boat owners who purchase 12-month policies. At least, this is one interpretation of Mr. Longman's testimony. But, people who charter vessels strictly in Maine rarely purchase year-round policies, because of the winter weather. There was never an explanation why underwriters would differentiate between year-round and seasonal policies for purposes of extending trip coverage. Presumably, the risk of a trip to Bermuda is the same whether a vessel owner has a year-round or seasonal policy. At the very least, the issue remained ambiguous and the jury was entitled to significantly discount the Defendants' insistence that no marine coverage would be available to Frank P. for a trip from Florida to Maine without navigational limits.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of November, 2006